UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 17-cr-00249-CMA-GPG-1 |
| | . | |
| Plaintiff, | . | |
| | . | |
| vs. | . | 103 Sheppard Drive |
| | . | Durango, CO  81303 |
| BROOKE ELIZABETH SACKSE, | . | |
| | . | |
| Defendant. | . | |
| | . | January 26, 2023 |
| . . . . . . . . . . . . . . | . | 10:03 a.m. |

**TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
GORDON P. GALLAGHER, UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office-Denver |
| | By:  Peter G. Hautzinger* |
| | 205 North 4th Street |
| | Suite 400 |
| | Grand Junction, CO  81501 |
| | (970) 241-3843 |
| | |
| For the Defendant: | Office of the Federal Public |
| | Defender-Denver |
| | By:  Timothy P. O'Hara* |
| | 633 Seventeenth Street |
| | Suite 1000 |
| | Denver, CO  80202 |
| | (303) 294-7002 |
| | |
| Also Present: | Brooke E. Sackse, Defendant* |
| | Jason Cohen, Probation Officer* |
| | |
| Court Recorder: | Clerk's Office |
| | U.S. District Court |
| | 103 Sheppard Drive |
| | Durango, CO  81303 |

*All appearances by video/telephone.

1   Appearances continued:

2   Transcription Service:          AB Court Reporting & Video
                                    216 16th Street
3                                   Suite 600
                                    Denver, CO  80202
4                                   (303) 296-0017

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                    (Time Noted:  10:03 a.m.)

2            THE COURT:  Good morning, everybody.  I know we

3    were conceivably waiting for a probation officer.

4            Is Mr. Cohen with us by phone maybe?

5            MR. COHEN:  Yes, Your Honor, this is Jason Cohen

6    on the line.

7            THE COURT:  Fantastic.  All right.  Good morning,

8    Mr. Cohen.

9        (Pause)

10           THE COURT:  All right.  Good morning, everybody.

11   We're here in 17-cr-249.  This is the United States versus

12   Ms. Brooke Elizabeth Sackse, who is present in custody in the

13   courtroom.

14           Mr. Hautzinger -- well, let me ask.  We are on the

15   record, Ms. Berg?

16           THE COURT CLERK:  Yes, we are.

17           THE COURT:  All right.  Thank you very much.  Mr.

18   Hautzinger is on by video, as is Mr. O'Hara.  Can both of you

19   all see and hear us?

20           MR. HAUTZINGER:  I can, Your Honor.  Thank you.

21           MR. O'HARA:  And I can, as well, Your Honor.  Good

22   morning.

23           THE COURT:  Good morning.  All right.  Good

24   morning to everybody.

25           Let's start with the issue of remote appearance.

1 │ Mr. O'Hara is appearing remotely.  Sir, do both you and your

2 │ client consent to you appearing in that fashion?

3 │ MR. O'HARA:  Yes, Your Honor.  I have discussed

4 │ this with Ms. Sackse, and she agrees to my appearance by

5 │ video today.

6 │ THE COURT:  All right.  Ms. Sackse, any problem

7 │ with that from your perspective?

8 │ MS. SACKSE:  No, sir.

9 │ THE COURT:  Okay.  And I'll tell you what that

10 │ does not do in any way is deprive you of the ability to

11 │ consult with your counsel as we're going along today.

12 │ At any point in time, if you want to speak with

13 │ him, all you need to do is let me know.  We can make that

14 │ happen either privately or openly so that you have a full

15 │ ability to talk to him.

16 │ But I can't read your mind.  So if that's

17 │ something you want to do, I'll need you to let me know.

18 │ Similarly, I know Mr. O'Hara will let me know if

19 │ he wants to speak with you.  Okay?

20 │ MS. SACKSE:  Okay.

21 │ THE COURT:  All right.  And I know Mr. Cohen can

22 │ hear us, because he has already responded that he is there.

23 │ So we're set for a detention hearing on this

24 │ matter.  I have reviewed in advance of today a number of

25 │ documents.  I've gone back and reviewed in total document

1   103, which is the petition for warrant. I have also reviewed

2   Defendant's exhibits A and B that were e-mailed to me this

3   morning. I have reviewed the pre-sentence report. I have

4   reviewed other sentencing documents, some of which are sealed

5   in this matter.

6         And I'm fully up to speed on this matter at this

7   point in time.

8         The burden is on the defense. I don't know who

9   wants to go first, and if you all have discussed that or not.

10         Mr. O'Hara, Mr. Hautzinger, have you all discussed

11   the order of presentation?

12         MR. O'HARA: We have not, Your Honor. But since

13   it's my burden, I'm happy to go first.

14         THE COURT: Mr. Hautzinger, any problem with that?

15         MR. HAUTZINGER: That's fine here. No problem.

16         THE COURT: Anybody have a problem with just going

17   ahead and admitting A and B at this point so we don't have to

18   deal with that anymore?

19         MR. O'HARA: I would seek their admission, Your

20   Honor.

21         MR. HAUTZINGER: No objection.

22         THE COURT: Okay. A and B are admitted. All

23   right, go ahead, Mr. O'Hara.

24         MR. O'HARA: Thank you, Your Honor. I'll start

25   briefly with an overview of what the law is that's governing

1  this decision that says she has the right to have a detention

2  hearing, but it's my burden to present clear and convincing

3  evidence that she's not a flight risk or that she won't pose

4  a danger to the community.

5         Kind of also another corollary issue, Your Honor,

6  is the idea of a preliminary hearing, which she is entitled

7  to if she's going to remain in custody.

8         So, I'm happy to pull the detention cart before

9  the preliminary hearing horse, or we can have it in reverse.

10 It's really up to the Court.

11         But we set this for a detention hearing.  I'm

12 prepared for both, if necessary, but I think it would be

13 prudent to proceed on the issue of detention, and, if

14 necessary, proceed on the issue of preliminary hearing.

15         THE COURT:  Let me stop you on that, Mr. O'Hara,

16 because that would kind of be flipping our presentation.

17         Mr. Hautzinger, is the Government read to have a

18 preliminary hearing today?

19         MR. HAUTZINGER:  Not really, Your Honor.  My

20 understanding was that I thought we had a joint agreement

21 that Ms. Sackse would be going into Women's Recovery Center.

22 I don't see the need for a preliminary hearing.

23         THE COURT:  Okay.

24         MR. HAUTZINGER:  But I haven't heard -- there's

25 been email discourse between myself and Mr. O'Hara and Mr.

1  Cohen, but Mr. Cohen hadn't responded.  If Mr. Cohen isn't

2  objecting to it, I'm not either.

3          THE COURT:  All right.  Well, Mr. Cohen, what's

4  your thought on a preliminary hearing today?

5          MR. COHEN:  Your Honor, it was my understanding

6  that the parties' agreed release to WRC would be an

7  acceptable term of release.  I'm ready to do a preliminary

8  hearing, if needed.

9          And I do think we'll need to closely examine the

10  issue of detention when she gets close to release from that

11  program.  I think it's often assumed that one kind of goes to

12  the street, or releases from that program after successfully

13  completing it.  I'm not sure that would be appropriate in

14  this case.

15          But for now, the probation office believes release

16  to WRC is an appropriate condition of release.

17          THE COURT:  Okay.  In this posture, I think it

18  makes sense not to have a preliminary hearing today.

19  Obviously, if I decide not to go along with -- obviously, I

20  understand everybody else is recommending, then we'll have to

21  set a preliminary hearing on the back end.

22          But let's go ahead with your presentation, Mr.

23  O'Hara.

24          MR. O'HARA:  Great.  Thank you, Your Honor.

25  Detention here is not appropriate.  There are, by all means,

1   conditions of release that would reasonably assure Ms.

2   Sackse's appearance in Court, and which would not pose a

3   danger to the community.

4           I'll just say up-front what those conditions are.

5   I echo Mr. Cohen's sentiment that she would enter into the

6   Women's Recovery Center.

7           Based on the timing of this, that would not be

8   today.  That will now be at the earliest on Monday.  But

9   there is availability, and they expect it to be available on

10  Monday and next week.

11          If the Court would like to impose GPS monitoring,

12  I think Mr. Cohen mentioned it at the last hearing, that that

13  was a condition of the Mesa County case that's currently

14  pending.  We have no objection to that.

15          We also have no objection to daily and/or weekly

16  drug testing.  As the Court will hear in a later part of my

17  colloquy, drug use is potentially, if there is a hold up or a

18  hang up, it would be on that front, potential drug use.

19          And so Ms. Sackse is, by all means, willing to

20  submit to drug testing as frequently as the Court would like.

21          The way the Bail Reform Act works is, detention is

22  only appropriate when there are no conditions.  And so drug

23  testing would be a condition that would alleviate any concern

24  about drug use.

25          And if there is a positive drug test, we're right

1  back before the Court and we're determining this issue of

2  detention.  I can't say my argument would be very strong at

3  that point.

4          But let me just give the Court my assessment of

5  this.

6          As far as flight risk, I don't think there's a

7  credible argument that she's a flight risk.  I think any

8  issue that could be raised in this case would be on the issue

9  of danger to the community, and those conditions that I

10 mentioned would, by all means, reasonably assure that she

11 doesn't pose a danger to anyone in the community.

12         She is -- on the flight risk, she is born and

13 raised in Grand Junction.  She has lived here her whole life.

14         She's been on supervision on one form or another

15 by the Federal Probation Department since September 25th of

16 2017.  It should not be lost that prior to her sentencing,

17 when the sentence was not by any means determined, it wasn't

18 an agreed upon sentence, we were close.  But there was still

19 the possibility she would go into jail.

20         She showed up to all Court dates.  And referring

21 to paragraph 8 of the pre-sentence investigation report,

22 since she was released on September 25th of 2017, she

23 remained compliant with her pre-trial release conditions all

24 the way through sentencing, which was in March of 2019.  So

25 about 18 months after she was released from custody.

1         So that's a very significant piece to this puzzle,

2    that she has complied with supervision before, even when

3    there was risk of her going to jail on the line, she didn't

4    run, and she came to Court.

5         Now we add to that puzzle another piece, which is

6    very significant, that she's been supervised since March of

7    2019 by Mr. Cohen, or someone with the United States

8    Probation Department.  And we're now in 2023.  She was placed

9    on supervision for a period of five years.  We're almost four

10   years through that.

11        So she has spent a significant portion of her

12   supervised release in compliance.  I understand there are

13   some allegations that date back to the beginning of 2022, but

14   that would still be nearly three years of supervision that

15   has not been commented on in the petition.

16        So, she's 30 years old.  She is a mother of two.

17   She has a son who is five, and a son who is eight months.

18        She is a single mom, for all intents and purposes.

19   She's been raising these children by herself.  And the father

20   of the five year old is Jay Lincolnholder, who is I think

21   familiar to the Court, was her co-defendant essentially -- he

22   wasn't charged as a co-defendant, but he was subsequently

23   charged.

24        And so he's been in prison until very recently.

25   So she's been raising these children by herself.

1        She's been working, and she started working while
2  she was on supervision at Rio Café as a cook.  She moved to
3  Denny's, worked there for a period of time as a server, and
4  then COVID hit and Denny's was not able to function in its
5  normal fashion, so she spent some time unemployed.

6        She spent some time just being a mom, and a good
7  mom at that.

8        And then in about December of 2021, she got
9  employment at the Fishing Hole, which is a game room in Grand
10  Junction.  It's a skilled gaming facility, and she's worked
11  there since December of 2021.  So for over a year.  She's
12  still employed there if she gets released.  That's exhibit B,
13  I believe, is the letter -- or the message from her employer.

14        Now, the Court raised a concern, and
15  understandably so, about the underlying case.  What I will
16  say about that is that Ms. Sackse's ties to Mr. Lincolnholder
17  were a direct result of her conduct in that case.  She was
18  called on the phone in a panicked way by Mr. Lincolnholder,
19  telling her to come -- this is all in sentencing filings,
20  Your Honor, that come to his house, drive his car, she got
21  behind of the wheel of his car, and started driving.  And the
22  car had contraband in the trunk.  A lot of contraband,
23  including firearms.

24        And so her "possession" of those materials was
25  brief, and it was at the pressuring of Jay Lincolnholder.

1           And ultimately Judge Chaffin determined that a

2   sentence of time served was appropriate, when he considered

3   all of those facts and all of the circumstances of that

4   offense.

5           So, then we turn to really why we're here, which

6   is that this petition was filed, and it's based on, in large

7   part, not entirely, but in large part, an incident that

8   occurred on November 7th going into the early morning hours

9   of November 8th, in which Ms. Sackse discovered her son, who

10  at that time was approximately five months old, in distress,

11  and didn't know what to do.

12          She was living with her father, and she has lived

13  with her father for some time while on supervision, and they

14  did the right thing.  They called an ambulance.  Ms. Sackse

15  rode in the ambulance with her son to the hospital.  And at

16  the hospital, they determined that at some point, somehow,

17  that the child had ingested or had methamphetamine in the

18  child's system.

19          The child recovered after efforts, medical

20  efforts, were made.  And I'm not aware of any lasting injury

21  to the child, although that wasn't clear for a period.  It

22  was touch-and-go.

23          This incident was extremely traumatic for Ms.

24  Sackse.  She has since lost custody of both of her children,

25  which has been very, very difficult on her.

1        And so I think understandably, somewhat

2  understandably so, her attentiveness on supervision dipped

3  after this incident.  And so you see that she wasn't

4  necessarily as compliant with the Probation Department's

5  rules as she had been before.  And that's in the months of

6  November and December.

7        And then she got arrested on the Mesa County case,

8  which brought this situation to a head.  I would note the

9  Probation Department did not see fit to file a petition until

10  after her arrest.  That speaks to whether she was a danger to

11  the community, I think, because if they had felt she was a

12  danger after this incident happened, they wouldn't have

13  hesitated to -- I don't want to speak for them, but it would

14  have been much more logical to file a petition immediately,

15  get her arrested, and get her before this Court.

16        But what we're seeing now is that the timing of

17  the petition being filed after the charges in Mesa County,

18  then we have a very helpful analysis, or we have a helpful

19  fact, in that a judge has reviewed the underling facts of

20  this Mesa County case from November of 2022, and has

21  determined that Ms. Sackse was eligible for -- not only

22  eligible, but was granted release on conditions of release to

23  the Women's Recovery Center.

24        Her lawyer in that case has worked hard to set up

25  placement in that facility.  That's why we're able to step in

1  and have it ready.

2       The judge that's handling that matter is

3  particularly important, because if it were a judge who had

4  never heard or seen Ms. Sackse before, then it might not bear

5  as much weight as if it were the actual prosecutor from her

6  underlying federal conviction.  That person, His Honor now,

7  Jeremy Chaffin, knows Ms. Sackse very well and knows her case

8  -- knew her federal case very well.

9       And so I have no doubt he gave it thorough

10  consideration and determined that bond was appropriate,

11  considering all of the circumstances.

12       And just to speak briefly on the case itself, the

13  charges itself, there is no allegation of intentional abuse.

14  And if there is a theory of prosecution that I can see, it

15  would be under a reckless-type crime.

16       And when we speak about this in the context of

17  detention, that crime in the context of detention, the

18  recklessness was towards children that she no longer has

19  custody of.

20       And so she's only able to see them through -- I

21  believe it's called the Griffin Center, which is a place

22  where they have supervised visits for children with their

23  parents and family members.  And that's the only way she's

24  able to see her kids right now, is my understanding.

25       So, getting back to that initial benchmark, or

 1  threshold, does she pose a danger to the community?  No.  No.

 2  Releasing her would not pose a danger to the community,

 3  especially if she's released to the Women's Recovery Center

 4  where she's going to be supervised, and she's going to be

 5  drug tested, she's going to be going to treatment, which is

 6  relapse prevention.

 7      This Court has been doing this work for a long

 8  time, whether as a practitioner or on the Bench, and this

 9  Court knows how, unfortunately, frequent relapses are.  And

10  that's not to excuse them.  But it is to say that they are

11  relatively normal, and with relapse prevention, Ms. Sackse

12  can and will, in my opinion, get right back on the right

13  track.

14      So, Your Honor, the -- if I may just have one

15  moment.

16      THE COURT:  Absolutely.

17    (Pause)

18      MR. O'HARA:  I believe that -- thank you.  I

19  believe that I have met the burden, that I've presented, both

20  with my proper and the evidence I've presented to the Court,

21  as well as her history of supervision, and that's mostly

22  positive, that there is clear and convincing evidence that

23  she doesn't pose a flight risk or a danger to the community.

24      So, thank you very much, Your Honor.

25      THE COURT:  Thank you, Mr. O'Hara.  Mr.

1  Hautzinger?

2        MR. HAUTZINGER:  Your Honor, I have little to

3  disagree with in what Mr. O'Hara is stating or arguing.

4        A couple of points I want to make.  And I just

5  think this should be on the record, although I'm sure the

6  Court is well aware of it.

7        Yes, Judge Chaffin did choose to give the

8  Defendant a personal recognizance bond in State Court.  But

9  it's also a $200,000.00 personal recognizance bond, which is

10  extraordinarily high and significant.  I don't believe I've

11  ever seen a PR bond that high.  And I think that speaks to

12  the level of concern that Judge Chaffin had in giving her an

13  opportunity to be released.  This is not just your run of the

14  mill PR bond.  It is extraordinary.

15        I also have some concerns about her employment.  I

16  have been involved -- and I know, as a matter of fact, now

17  Judge Chaffin has been involved in numerous investigations

18  concerning these gaming establishments.  And they seem to be

19  something of magnets for criminal behavior.

20        I am not stating that I know that this one is, or

21  that there's anything untoward about it, but it's not my

22  ideal form of employment for somebody who is skating on thin

23  ice, as Ms. Sackse is.

24        Having said that, since she doesn't have custody

25  of her children, I can't disagree about the risks to

1  particular individuals.

2           And, finally, as the Court knows, throughout my

3  career I've been an advocate of trying to get treatment for

4  people who need it.  And if we can do that and eliminate the

5  criminal behavior, that's what we ought to be doing.

6           So, Ms. Sackse has been given a lot of chances,

7  but I'm not going to stand in the way of giving her one more.

8           THE COURT:  Thank you, Mr. Hautzinger.  Mr. Cohen,

9  anything else you think we should be considering?

10          MR. COHEN:  Yes, Your Honor.  I would like to just

11  clarify a couple points.  I think Mr. O'Hara characterized

12  this fairly well.

13          But really what -- why our office didn't petition

14  for a warrant after learning of this new case was because

15  when Ms. Sackse came in the office for the first time to

16  discuss it, she expressed her willingness to go in to in-

17  patient treatment.  So we were kind of holding on to that,

18  and that's what kept us from submitting that petition.  I

19  thought that gave her the best chance at recovery.

20          I would also note that after I learned of that --

21  the incident involving her child, I couldn't get a hold of

22  Brooke.  It's been an ongoing issue throughout her period of

23  supervision.  She simply would not return my calls.

24          I did get a hold of her dad, and after contacting

25  her dad, she promptly called me.

1    Ms. Sackse has essentially reported that.  When I

2  call her, those calls just don't go through, and are

3  reflected.  And she has said that for some time.

4    But anyway, she expressed her willingness to go to

5  Women's Recovery Center.  I thought that was a fantastic

6  opportunity for her.

7    But then towards the end of December, both I am

8  the Women's Recovery staff were trying to get a hold of Ms.

9  Sackse, and she wasn't returning any of our calls.  She

10  wasn't doing her weekly call-ins, as required.

11    So while she didn't flee the area, she had

12  essentially absconded from supervision.  She had stopped

13  substance use testing, despite the incident with her kids,

14  and she wasn't going to treatment.

15    And ultimately, because we couldn't get a hold of

16  her, and she wasn't pursuing that opportunity at Women's

17  Recovery Center, that's why we petitioned for the warrant.

18  And our petition, it's a small point of clarification, but

19  our petition was submitted on January 3rd for her federal

20  case, and the affidavit for warrant in her state case for the

21  child abuse was submitted on the 5th, and she was promptly

22  arrested.

23    A couple of other points.  This decline in

24  Brooke's performance was devastating to watch.  I agree with

25  Mr. O'Hara that a lot of our older violations are technical

1    issues we normally wouldn't bring before the Court.  I just

2    included those on the petition to establish sort of a pattern

3    in her decline in participation and supervision.

4            But for a long time she did well.  I did supervise

5    her from basically the beginning.  I've known her and her

6    children for years.  And this decline in performance is a

7    more recent thing, but it's also a little bit more dynamic

8    than just a new case alone.

9            I need to know -- I don't -- Mr. Lincolnholder is

10   not doing well on supervision, and he was released last year.

11   And I can't help but think part of the decline in Brooke's

12   performance on supervision is associated with his release.  I

13   don't have proof of that.  I've just heard third party

14   reports that they are spending time together, and I know Mr.

15   Lincolnholder is not at all in compliance with his

16   supervision.

17           And, you know, his decline in supervision

18   performance and his release coincide, sort of, with Brooke's

19   decline.  So I think that's something the Court should look

20   at.

21           Also, we're -- our office isn't asking for GPS

22   monitoring.  II was just noting that that's a condition of

23   bond in her state case.  I don't think there's a need to

24   double dip in that sort of monitoring.  I think state

25   monitoring via GPS is enough.

1   And also, as the Court knows, our office would be
2   promptly notified if Ms. Sackse did leave WRC, which is not a
3   lock down facility, but it's not easy to leave, either.  I'm
4   confident we would be notified immediately should she leave
5   that facility.
6   Those are really the only points I wanted to
7   clarify, Your Honor.
8   THE COURT:  Thank you, Mr. Cohen.  Do you have any
9   details about Ms. Sackse's arrest on the underlying warrants?
10  MR. COHEN:  Your Honor, most of what I have is
11  summarized in count one.  And to speak plainly, I don't even
12  have the affidavit in that case yet, so I believe Mr. O'Hara
13  probably has more information.
14  I've only had conversations and a preliminary
15  report from Officer Berg, the investigator.  I haven't
16  received a copy of the affidavit yet.
17  THE COURT:  All right.  Thank you.  Mr. O'Hara,
18  anything further you want to add, sir?
19  MR. O'HARA:  No, Your Honor, I don't think so.
20  The -- I would just -- it probably bears mentioning about Mr.
21  Lincolnholder and what to do about this.  Some guidance might
22  be helpful.
23  She has a child with him, and it puts her in a
24  very awkward position that even if she doesn't necessarily
25  want to be around him, and can't, by the Court, he has rights

1   to his child that she doesn't want to stand in the way of.

2          And so that's part of the tension here, is that

3   she's in a bad place as far as trying to make sure her son is

4   able to see his father, but not run afoul of Court orders.

5          And so obviously she can't be in contact with

6   convicted felons without permission from the Probation

7   Department.  So that condition is abundantly clear.  I just

8   think that -- well, just to talk about it in the courtroom is

9   probably helpful for her to hear about what she can and can't

10  do.

11          THE COURT:  Thank you, Mr. O'Hara.  Mr.

12  Hautzinger, anything further you think we should note from

13  your perspective?

14          MR. HAUTZINGER:  No, thank you, Judge.

15          THE COURT:  Well, as the parties know, but I think

16  needs to be clearly stated for the record, we are here today

17  in a very limited capacity.  There are other matters with

18  regard to this that may be assigned to me, depending upon the

19  course of where this case goes.

20          But at this juncture, we are here under Rule 32.1,

21  based off of a petition for revocation of supervision.

22          And my role at this point in time is solely, under

23  sub-section (6), to address release or detention.

24          And Congress has clearly established the burden as

25  a clear and convincing burden, and a burden that the defense

1   must meet in this posture, given the fact that, at least as

2   to the underlying offense, the Defendant no longer enjoys the

3   presumption of innocence because -- and I'm talking about the

4   2017 offense, to be clear, not the new State Court offense to

5   which she absolutely is entitled to the presumption of

6   innocence, but with regard to the underlying 2017 offense,

7   because in this case she entered a change of plea some years

8   after that.

9           We have not yet reached the preliminary hearing

10  stage.  That stage only gets reached if the Defendant remains

11  in custody.  And, of course, this was discussed at a hearing

12  a couple of days ago.  Ms. Sackse may be entitled to that,

13  and is entitled, of course, to a supervised release hearing

14  if probably cause is found to support one or more of the

15  alleged offenses; that to be, of course, the province of the

16  District Judge if that's where this goes.

17          I'm also very aware that the -- essentially

18  unanimous recommendation, with some caveats, but unanimous

19  nonetheless, of both the Government and the defense and

20  Probation, is for Ms. Sackse to be released in this case to

21  Women's Recovery Center, to the extent that that is release.

22          And it is unusual, if not a singular circumstance

23  here, where I must and do disagree with all of those

24  recommendations, and find that Ms. Sackse is a danger to the

25  community such that that burden has not been overcome.

1          And I am going to remand Ms. Sackse.  And I say

2     that at the beginning, because I don't like to hide the ball

3     about where I'm going.  But ultimately that is my

4     determination.

5          But given the fact that I am essentially, in many

6     ways, overriding that unanimous recommendation, I think this

7     bears some additional explanation by way of a discussion of a

8     variety of factors.

9          As I indicated at the beginning of our hearing, I

10    did a deep dive back into the documents related to all of

11    these matters.  I'm going to start with the 2017 case there

12    that started with the traffic stop.  I know there have been

13    various explanations for that, and to be clear, I am in no

14    way faulting the judicial officer who entered a sentence here

15    or countermanding that in any way.

16         What I do believe is that after looking at

17    paragraph 15 of the pre-sentence report on page 5 at document

18    97, that there is reason to believe that Ms. Sackse's

19    involvement in the offense was more than just this phone call

20    from Mr. Lincolnholder, with whom she was at that time

21    pregnant with his child, if I'm recalling, a number of months

22    pregnant, perhaps that this was just some call to make a

23    delivery.

24         Following her arrest, there was a phone call from

25    Ms. Sackse at the Mesa County Jail to somebody by the name of

1  Kevin, who stated that she was fucked, that the officers had

2  searched the car, they had found the fucking AK and

3  everything, all the weed that was in the car, all the fucking

4  dope, everything in the car was found.

5         The information set forth in document -- or

6  paragraph 13, significant amounts of drugs, guns, ammo, and

7  the like.  More guns and ammo than drugs.  The drugs were

8  limited to marijuana and some bags of Psilocyn, and

9  eventually it was the Psilocyn offense that Ms. Sackse pled

10 guilty to.

11        Following her arrest in that case, an arrest that,

12 at least in some ways, it appears to Mr. Lincolnholder by way

13 of some kind of erratic driving, tried to prevent, but

14 ultimately was unable to, Ms. Sackse did very well.  That's

15 not disputed.  As she has done well through at least a

16 portion of her supervised release here.

17        She appeared to get clean, discussed in the

18 sentencing documents filed by her counsel, that the reasoning

19 for that was her pregnancy, wanting to not use

20 methamphetamine during that course, and trying to clear up

21 her act.

22        Unfortunately, that is belied by her prior

23 criminal history coming into this before that case.  When I

24 review Ms. Sackse's criminal history, which starts as a

25 juvenile with a theft case in 2008, which contained four or

five revocation of probation requests by State Probation.

Then a felony menacing case that contained a similarly high number of probation revocation requests.

Then a theft case that started off as a deferred, and it failed abysmally with multiple probation revocations, ending up in a COMCOR sentence.

Then a failure, similarly, on a driving while ability impaired. And then a DUI case. Then a false reporting case. Then a burglary case. Leading up to the 2017 case.

Reading between the lines, again and again, many of those failures unfortunately were blamed on other people and other circumstances. But the common detail here is that they were all Ms. Sackse.

Looking at our probation violation allegation here, document 103, the particular concern, of course, is the underlying offense where the five month old child was brought to St. Mary's, ultimately Flight for Life, to -- it looks like to Denver, probably to Children's, although that's not set forth therein.

And it appears that it was methamphetamine exposure that led to that. Ultimately, a search warrant of the house found a methamphetamine pipe in the bedroom that the Defendant was sharing with her child.

Going back, the allegations set forth in the

1 probation violation, or supervised release violation

2 complaint, stretch back almost a year, with various failures

3 to report and comply, and contact failing to report, law

4 enforcement contact after driving when not being allowed to.

5          And then in late 2022, the ability and the

6 availability for Ms. Sackse to attend exactly the program

7 that she now wants to attend as a condition of release, that

8 being Women's Recovery, with a component of Mind Springs

9 there, and essentially Ms. Sackse blowing that off and

10 deciding, for whatever reason, not to follow through and

11 complete her intake packet or do any of those things,

12 ultimately landing us here.

13          To be clear, I don't find Ms. Sackse to be likely

14 to flee.  She might drop off the radar, but I think she would

15 be found.  She doesn't seem to go anyway that she isn't

16 findable.

17          My greater concern is her danger to the community

18 when she is back involved in the drug world, which all of the

19 evidence clearly shows me that she is here, whether that's

20 her choice, a combination with Mr. Lincolnholder, or other

21 factors.  Maybe it's a factor of where she's working, maybe

22 not.  She gets involved in dangerous activity.

23          In the underlying case, it was drugs and guns.

24 Here, it was the incredibly unfortunate and dangerous

25 circumstance of drugs and a young child that ended up with

1   the young child being transported.

2           I understand that the intent here is to get Ms.

3   Sackse into drug treatment, something that she's been in and

4   out of, and at times succeeded, sometimes failed, but when

5   she's using drugs she gets involved in incredibly dangerous

6   behavior, behavior that is -- well, has led to dangerous

7   things, including a child.  And I know the child has now been

8   removed, but I think that's emblematic of the complete

9   disregard that Ms. Sackse has for anything else other than

10  her drug use, because if she had regard for anything in the

11  world, it would be her child.

12          And here, how ever sorry she might be about the

13  circumstances, both the injury that could have occurred or

14  did occur to her child, and the circumstance that then leads

15  us to be here today, and her losing her child, the clear

16  indication is that when she's using drugs, all of those

17  concerns go out the window.

18          And I don't have proven to me, by clear and

19  convincing evidence, that putting her in a facility that she

20  can walk away from, will not lead to her walking away.  Maybe

21  we'll catch her, but maybe not in time to not have something

22  else bad happen to somebody.  She walks away and runs with

23  Mr. Lincolnholder, whose got a gun, and she goes and drives

24  and does a drug deal, and somebody else gets hurt or killed,

25  I think it's too much danger.

1          And it is unfortunate, because, clearly, Ms.

2     Sackse needs treatment.  But more clearly, the community

3     needs safety from the actions that Ms. Sackse takes when

4     she's using drugs.

5          And, here, after almost a decade of history or

6     more, where we end up is that the community's need for safety

7     has to override Ms. Sackse's need for treatment.

8          And Ms. Sackse is being held without conditions of

9     release, and is remanded to the custody of the United States

10    Marshals Service.

11         With that in mind, do we need to set a preliminary

12    hearing, Mr. O'Hara?

13         MR. O'HARA:  Yes, please, Your Honor.

14         THE COURT:  How soon do you want me to look at

15    setting that?

16         MR. O'HARA:  Well, --

17      (Pause)

18         MR. O'HARA:  Would the Court have any availability

19    tomorrow to do the hearing, if I could -- would I be able to

20    do this by VTC, Your Honor?

21         THE COURT:  I don't have a problem with that, as

22    long as there is unanimous consent between you and your

23    client.  I think General Order 20-4, follow-on orders, and

24    the CARES Act still authorize that, so as long -- I expect

25    strongly, but I won't speak for Mr. Hautzinger, but I'm

1  guessing he won't object to that.

2          So I guess let's start with that.  Mr. Hautzinger,

3  does the Government object to that?

4          MR. HAUTZINGER:  Your Honor, I am still positive

5  for COVID, so I cannot appear personally.  I also have a

6  twice delayed dentist appointment at 3:00 o'clock in the

7  afternoon tomorrow afternoon that I cannot postpone again.

8          But with those two caveats, and assuming that Mr.

9  Cohen can be present to be hopefully present in-person in

10 Court, I can accept tomorrow.

11         THE COURT:  Okay.  Do you have an objection to --

12 and I don't have any problem -- I'm not disregarding the

13 Government's right to appear personally, but I'm more

14 concerned about Ms. Sackse's ability to have meaningful

15 assistance of her counsel, and that is a show stopper.

16         But does the Government have an objection, if Ms.

17 Sackse and her attorney are okay with it, with Mr. O'Hara

18 appearing remotely?

19         MR. HAUTZINGER:  I do not, Your Honor.

20         THE COURT:  All right.  Ms. Sackse, is that

21 something that you know the answer to right now, or do you

22 want some time to speak with your attorney about?

23         MS. SACKSE:  I'm fine.

24         THE COURT:  Okay.  Ms. Sackse is indicating she

25 doesn't object to that.  So I can offer, keeping in mind what

1  Mr. Hautzinger just said about appointments and the like, I

2  can offer 8:00 in the morning tomorrow.

3           THE COURT:  I guess I should ask the Court Clerk.

4  Are you available to clerk that?  Angela is out of town.  If

5  not, we could ask somebody in Denver.

6           THE COURT CLERK:  Yes, I could do that, Your

7  Honor.

8           THE COURT:  Okay, thank you.  Mr. O'Hara?

9           MR. O'HARA:  Your Honor, would you be available at

10  10:00 a.m. by any chance?  Or 11:00?

11           THE COURT:  11:00 I could do.  Does that work for

12  everybody here?  Does 11:00 o'clock work better?

13           MR. COHEN:  Your Honor, I'm just wondering if we

14  might be authorized to have Ms. Sackse appear VTC from the

15  jail?

16           THE COURT:  I don't know if they'll do that at

17  11:00 in the morning.  If they will, Mr. O'Hara, do you have

18  a problem with your client being by video from the jail,

19  since I doubt strongly that she would be testifying?

20           MR. O'HARA:  I don't have an objection.  I'll

21  speak to her after this hearing.  If there becomes a problem

22  with that, I'll let the Court know.

23           THE COURT:  Okay.  Can everybody do 11:00?

24           MR. COHEN:  Yes, Your Honor.

25           MR. HAUTZINGER:  The Government can, Your Honor.

1          THE COURT:  Okay.  This matter, then, is set for a

2     preliminary hearing tomorrow, January 27th, at 11:00.

3          Anything else we need to address today, Mr.

4     O'Hara?

5          MR. O'HARA:  No, Your Honor.  Thank you.

6          THE COURT:  Certainly.  Mr. Hautzinger?

7          MR. HAUTZINGER:  No.  Thank you, Judge.

8          THE COURT:  Mr. Cohen?

9          MR. COHEN:  No, Your Honor.

10         THE COURT:  All right.  Thank you.  Thank you, Ms.

11    Berg.  Thank you, Marshals.

12         And we'll be back together tomorrow, then, at

13    11:00.

14                   (Time noted:  10:47 a.m.)

15                        *  *  *  *  *

16                          CERTIFICATE

17        I, RANDEL RAISON, certify that the foregoing is a

18    correct transcript from the official electronic sound

19    recording of the proceedings in the above-entitled matter, to

20    the best of my ability.

21

22

23    _____          February 3, 2023

24    Randel Raison

25